1

2                                    UNITED STATES DISTRICT COURT

3                                    NORTHERN DISTRICT OF CALIFORNIA

4

5    WILLIAM TRAVIS,                          Case No.: 14-cv-04068 YGR

6              Petitioner,                    ORDER DENYING PETITION FOR HABEAS
                                              CORPUS RELIEF
7         v.

8    DAVE DAVEY, Warden,

9              Respondent.

10

11        Now before the Court is petitioner William Travis's petition for writ of habeas corpus.

12   (Dkt. No. 1.)  The government has answered (Dkt. No. 12) and petitioner has replied (Dkt. No. 23).

13   The petitioner asserts two grounds for a *Brady* violation and, in the alternative, petitioner argues his

14   trial counsel rendered ineffective assistance.  Based thereon, petitioner seeks a writ of habeas

15   corpus.  For the reasons stated below, the petition for such relief is **DENIED**.

16   **I.    FACTUAL BACKGROUND**

17        On April 7, 2010, a Santa Clara County jury convicted petitioner of attempted premeditated

18   murder with enhancements for personal use of a handgun and infliction of great bodily injury.

19   Petitioner was sentenced to a term of thirty-two (32) years to life in prison.  In an unpublished

20   opinion addressing the petitioner's *Brady* claims on a direct appeal, the state Court of Appeal set

21   forth the following summary of facts:[1]

22             **Shooting of Williamson**

23             By 2009, appellant and Fred Williamson had known each other for
             about four years. Appellant was Mr. Williamson's rap music producer
24             and Mr. Williamson considered him to be a friend. On May 30, 2009,
             appellant picked up Mr. Williamson at Mr. Williamson's house in a
25             car driven by Tiara Lewis. A second passenger was in the car. This
             passenger was later identified as Ryne Scott, but at trial was referred
26             to as Dreadlocks or Dreads because he sported a dreadlocks hairstyle.

27   _____

28        [1] Footnotes included below within each quoted excerpt of the Court of Appeal's opinion
     come from the original, renumbered accordingly herein.

*(left margin)* United States District Court  Northern District of California

Ms. Lewis drove her car to a friend's house where appellant's car was parked. Appellant got into his car with Dreadlocks, but Mr. Williamson stayed in Ms. Lewis's car. After stopping at a liquor store both parties drove in separate cars to San Jose to Aretha Dillard's house.

According to Ms. Lewis, on the way to San Jose Mr. Williamson asked Ms. Lewis about her relationship with Dreadlocks and appellant; Mr. Williamson made some derogatory comments about them. Mr. Williamson told Ms. Lewis that he was jealous of appellant because appellant always had money. Ms. Lewis thought that Mr. Williamson did not like appellant, which made her nervous. At one point, Mr. Williamson pulled out some money as if he was trying to "entice" or impress her with the money.

Both parties arrived at Ms. Dillard's house around 10:00 p.m. Ms. Dillard was making dinner for her two daughters. Appellant and Ms. Dillard had had a dating relationship for about three years and Ms. Dillard had known Mr. Williamson for a couple of years. Ms. Dillard did not know either Dreadlocks or Ms. Lewis.

At Ms. Dillard's house Ms. Lewis became nervous and anxious to leave. She told Dreadlocks about the conversation she had with Mr. Williamson on the journey to San Jose; she asked Dreadlocks not to say anything to appellant. At one point, when Dreadlocks and appellant stepped outside, Ms. Lewis suspected that Dreadlocks told appellant about her conversation with Mr. Williamson. This made Ms. Lewis grow increasingly uncomfortable.[2]

According to Ms. Dillard, at some point appellant announced that his keys were missing and said that someone must have his keys. Appellant said that he was going to check Mr. Williamson's pockets and patted him. Mr. Williamson said that he did not have appellant's keys. Eventually, Dreadlocks took the keys from his pocket and tossed them onto the couch.

Appellant went outside with Mr. Williamson and asked him if he was talking about him behind his back. Mr. Williamson denied that he had been so doing. Mr. Williamson went into the house while appellant, Dreadlocks, and Ms. Lewis remained outside for a while. After they came inside, Dreadlocks told Ms. Lewis to tell Mr. Williamson what she had been saying to him and appellant while they were outside. Dreadlocks pressured her to "say it." Ms. Lewis testified that she was getting really nervous and uncomfortable. Eventually, Ms. Lewis said that Mr. Williamson had called appellant a "jay-cat."[3]   Ms. Lewis went upstairs to call a friend and when she

---

[2] Ms. Lewis referred to Dreadlocks as Reezy during her testimony.  However, for the sake of clarity we refer to him as Dreadlocks throughout our discussion of the facts.

[3] Mr. Williamson testified at trial that jay cat is a derogatory term for a person who "is not the sharpest knife in the drawer…"

returned she "bolted out the door."

According to Mr. Williamson, both appellant and Dreadlocks pulled out guns and accused Mr. Williamson of calling appellant a jay cat. Mr. Williamson became very scared; he testified he thought he was going to die. Ms. Dillard entered the room, but appellant told her to leave. At one point, appellant put the gun down by his side. Then he took a pillow from the couch and placed it in front of the gun. Dreadlocks told appellant, "You got to do him now because you done pulled a gun on him. You got to do him." When appellant said that he was going to "give him a pass," Dreadlocks urged appellant to shoot Mr. Williamson so that he would not come after appellant and shoot him. Appellant shot Mr. Williamson in the abdomen, after which appellant and Dreadlocks ran from the house. Ms. Dillard called the police. Mr. Williamson denied having a gun in his possession on the day of the shooting.

Ms. Dillard was interviewed by Officer Peralez on May 30, 2009, shortly after the incident and again later. A recording of both the interviews was played for the jury. In her first statement, Ms. Dillard claimed she was in the bathroom when she heard a pop sound. After Officer Peralez spoke with Ms. Dillard's daughter, who told him that she saw a gun, Officer Peralez re-interviewed Ms. Dillard and confronted her with her daughter's statement that she saw a gun. Ms. Dillard confessed that she saw both appellant and the "other guy" pull out guns and argue with Mr. Williamson. Ms. Dillard testified that it was Dreadlocks that had the pillow in front of his gun, but admitted that she told a detective that appellant put a pillow in front of his gun. However, she testified that she said that because she was scared. Much of Ms. Dillard's trial testimony differed from the accounts she gave officers after the incident in that she tried to place the blame on Dreadlocks and that it was Mr. Williamson that had a gun not appellant.[4] She admitted that she loved appellant.

Ms. Dillard's daughter, who was eight years old at the time of trial, testified that she saw Dreadlocks get angry with Mr. Williamson; she saw Dreadlocks point a gun at him. Her mother told her to go into the bathroom and lock the door. Inside the bathroom, she heard a gunshot.

**Defense Case**

Appellant did not testify. However, the defense called Officer Billy Beason of the Hercules Police Department to testify about prior incidents of domestic violence involving Mr. Williamson in order to attack Mr. Williamson's credibility. The court gave the jury a limiting instruction and informed them that alleged domestic violence incidents involving Mr. Williamson and his former girlfriend did not

---

[4] The jury heard a recording of Ms. Dillard's statements that she gave to Detective Barbara Melloch on June 2, 2009.

result in any conviction.[5]

> In addition to Officer Beason, the defense called Ray Hernandez, an investigator with the Santa Clara County District Attorney's Office. He testified that he interviewed Ms. Lewis on March 17, 2010. She told him that Mr. Williamson may have been making advances toward her during the car ride on the day of the shooting. She said that Mr. Williamson pulled out a large sum of money and seemed to be trying to impress her. Investigator Hernandez interviewed Mr. Williamson on March 18, 2010; Mr. Williamson acknowledged that he had owned a gun in the past.

*People v. Travis*, 2013 WL 989359, at *1-3 (Cal. Ct. App. March 14, 2013), *review denied* (June 12, 2013).  The California Supreme Court denied review of the appellate decision on petitioner's *Brady* claims and this federal habeas petition followed.

## II.   *BRADY* VIOLATION CLAIMS

### A.  Standard of Review

A federal court may entertain a habeas petition from a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a); *see also Rose v. Hodges*, 423 U.S. 19, 21 (1975).  Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), a district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).  The first prong applies both to questions of law and to mixed questions of law and fact, *Williams (Terry) v. Taylor*, 529 U.S. 362, 407–09 (2000), while the second prong applies to decisions based on factual determinations, *Miller–El v. Cockrell*, 537 U.S. 322, 340 (2003).

A state court decision is "contrary to" clearly established Supreme Court authority, that is, falls under the first clause of section 2254(d)(1), only if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a

---

[5] Officer Beason told the jury that he had responded to a call regarding domestic violence. He spoke to Mr. Williamson's former girlfriend who told him that Mr. Williamson had punched her on her head twice and once on her left shoulder.

1   case differently than [the Supreme] Court has on a set of materially indistinguishable facts."

2   *Williams (Terry)*, 529 U.S. at 412–13.  A state court decision is an "unreasonable application of"

3   Supreme Court authority, falling under the second clause of section 2254(d)(1), if it correctly

4   identifies the governing legal principle from the Supreme Court's decisions but "unreasonably

5   applies that principle to the facts of the prisoner's case." *Id.* at 413.  The federal court on habeas

6   review may not issue the writ "simply because that court concludes in its independent judgment

7   that the relevant state-court decision applied clearly established federal law erroneously or

8   incorrectly." *Id.* at 411.  Rather, the application must be "objectively unreasonable" to support

9   granting the writ. *Id.* at 409.

10          The state court's decision is reviewed for conformity with Supreme Court precedents that

11   existed at the time of that decision.  *Greene v. Fisher*, 132 S. Ct. 38, 44 (2011).  Section 2254(d)(1)

12   requires federal courts to "focu[s] on what a state court knew and did," and to measure state-court

13   decisions "against this Court's precedents *as of 'the time the state court renders its decision.*'"

14   *Cullen v. Pinholster*, 131 S. Ct. 1388, 1399 (2011) (emphasis supplied) (quoting *Lockyer v.*

15   *Andrade*, 538 U.S. 63, 72 (2003)).

16          Under section 2254(d)(2), a state court decision "based on a factual determination will not

17   be overturned on factual grounds unless objectively unreasonable in light of the evidence presented

18   in the state-court proceeding." *See Miller–El*, 537 U.S. at 340; *see also Torres v. Prunty*, 223 F.3d

19   1103, 1107 (9th Cir. 2000).  Even if constitutional error is established, habeas relief is warranted

20   only if the error had a "substantial and injurious effect or influence in determining the jury's

21   verdict." *Penry v. Johnson*, 532 U.S. 782, 784 (2001) (quoting *Brecht v. Abrahamson*, 507 U.S.

22   619, 637 (1993).).

23          In determining whether the state court's decision is contrary to or involved an unreasonable

24   application of clearly established federal law, or is based on an unreasonable determination of the

25   facts, a federal court looks to the decision of the highest state court to address the merits of a

26   petitioner's claims in a reasoned decision.  *Delgadillo v. Woodford*, 527 F.3d 919, 925 (9th Cir.

27   2008); *LaJoie v. Thompson*, 217 F.3d 663, 669 n.7 (9th Cir. 2000).

28   ///

United States District Court
Northern District of California

B. **Discussion**

Petitioner argues that the prosecution violated his rights under the Fifth, Sixth, and Fourteenth Amendments as established in *Brady v. Maryland* and its progeny by failing to disclose the identity and location of a material witness learned prior to trial. Petitioner additionally claims that the prosecution instructed its investigator not to take a discoverable statement from that witness until after the conclusion of petitioner's trial, also constituting a violation of his constitutional rights as announced in *Brady*.

1. **Legal Framework**

In *Brady*, the Supreme Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. 83, 87 (1963). The duty to disclose arises even where the accused has not requested such evidence, *Strickler v. Greene*, 527 U.S. 263, 280 (1999), and that duty encompasses impeachment evidence as well as exculpatory evidence, *United States v. Bagley*, 473 U.S. 667, 676 (1985).

There are three components to a *Brady* violation. *Benn v. Lambert,* 283 F.3d 1040, 1052 (9th Cir. 2002). First, the suppressed evidence must be favorable to the accused, either because it is exculpatory or because it is impeaching. *Bagley,* 473 U.S. at 676 (1985) (*citing Brady,* 373 U.S. at 87). Second, the evidence must have been suppressed by the government, either willfully or inadvertently. *United States v. Agurs,* 427 U.S. 97, 110 (1976). Third, the suppressed evidence must be material to the guilt or innocence of the defendant. *Bagley,* 473 U.S. at 676–78. Evidence is deemed material, *i.e.* prejudicial, only if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Id.* at 682.[6]

---

[6] The petitioner contends that the materiality of the prosecution's failure to disclose should be analyzed under the "harmless beyond a reasonable doubt" standard as announced by the state supreme court in *In re Jackson*, 3 Cal.4th 578, 595 (1992). Petitioner's argument is misplaced. The California supreme court has since deemed the *In re Jackson* standard for materiality to be "erroneous" and has explicitly rejected that line of cases. *In re Sassounian*, 9 Cal.4th 535, 545

United States District Court
Northern District of California

1    *Brady* has no good faith or inadvertence defense; whether nondisclosure was negligent or by

2    design, it is the responsibility of the prosecutor. *Gantt v. Roe,* 389 F.3d 908, 912 (9th Cir. 2004).

3    Moreover, the rule encompasses evidence "'known only to police investigators and not to the

4    prosecutor.'" *Strickler*, 527 U.S. at 280-81 (quoting *Kyles v. Whitley,* 514 U.S. 419, 438 (1995)).

5    To comply with *Brady,* therefore, "'the individual prosecutor has a duty to learn of any favorable

6    evidence known to the others acting on the government's behalf in this case, including the police.'"

7    *Id.* (quoting *Kyles,* 514 U.S. at 437).  But where "a defendant has enough information to be able to

8    ascertain the supposed *Brady* material on his own, there is no suppression by the government."

9    *United States v. Aichele*, 941 F.2d 761, 764 (9th Cir. 1991) (citing *United States v. Dupuy*, 760 F.2d

10   1492, 1502 n.5 (9th Cir. 1985)).

11       **2.  Analysis**

12       The petitioner claims that the prosecution's conduct violated his constitutional rights as

13   announced in *Brady* because the prosecutor (i) failed to disclose its knowledge of the true identity

14   and location of the person referred to as Dreadlocks, and (ii) instructed the government's

15   investigator not to take a discoverable statement from Dreadlocks until after the conclusion of

16   petitioner's trial.  The Court of Appeal recounted the salient facts:

17           Following appellant's conviction, defense counsel filed a non-
18           statutory motion to set aside appellant's conviction based on a *Brady*
             violation. Defense counsel argued that according to Ray Hernandez's
19           investigative reports received after the trial had concluded, the true
             identity of the person known as Dreadlocks at trial became known to
20           the investigator on March 26, 2010, when Ms. Lewis positively
             identified that person's Department of Motor Vehicles photograph.
21           Defense counsel alleged that neither the true identity of Dreadlocks
             nor his whereabouts were revealed to the defense during trial;
22           however, the prosecutor, during argument, had mentioned the name
             Ryne Scott for the first time in connection with telling the jury that
23           they were not to be concerned with what Dreadlocks/Ryne Scott was
             doing. Defense counsel stated that less than a week after the trial
24           ended, Mr. Scott was taken into custody and gave a statement to
25           Investigator Hernandez at the Alameda County Jail, in which in
             essence, Mr. Scott said that there was a tussle between appellant and
26
27

28   (1995).  Moreover, it is the United States Supreme Court's interpretation of the materiality of the
     prosecution's potential *Brady* violation – and not the state court's interpretation – that controls.

7

Mr. Williamson over Mr. Williamson's gun and the gun went off. Mr. Scott adamantly denied that he told appellant to shoot Mr. Williamson. Counsel argued that the prosecution was obligated under *Brady* to disclose this information to the defense because Mr. Scott's "version of events would have been extremely favorable to the defense."

The prosecutor filed opposition to the motion in which he provided a lengthy detailed chronology of events surrounding the discovery of Mr. Scott's true name and whereabouts. The prosecutor argued that learning Mr. Scott's name was not in and of itself *Brady* evidence. Further, the prosecutor asserted that appellant already knew the whereabouts of Mr. Scott because they were friends and it was appellant that brought him to Ms. Dillard's house on May 30, 2009. According to the prosecutor, an arrest warrant issued for Mr. Scott on April 5, 2010; he was arrested at his home in Oakland on April 13, 2010. Thereafter, on April 19, 2010, Investigator Hernandez took a statement from Mr. Scott in which he said that appellant picked him up at his house on the night of the shooting. Mr. Scott's statement to the investigator was turned over to defense counsel within a few days.

At the hearing on appellant's motion, the prosecution and defense stipulated that Investigator Hernandez showed Ms. Lewis a photograph of Ryne Scott on March 26, 2010; she identified him. Accordingly, as of that date, the prosecution knew Mr. Scott's full legal name, his date of birth, and his precise address. While agreeing to the stipulation, the prosecutor added that he personally did not know Mr. Scott's name, date of birth and address until April 2, 2010, and even then he was under the impression that Mr. Scott's first name was Ryan.

The court took judicial notice that the prosecutor's opening statement took place on March 29, 2010, and closing statements occurred on April 5, 2010. The jury returned its guilty verdict on April 7, 2010.

Defense counsel pointed out to the court that in Mr. Scott's statement to Investigator Hernandez, Mr. Scott said that Mr. Williamson had two weapons on him during the incident; counsel argued that Mr. Scott's exhortation to appellant to shoot Mr. Williamson was conspicuously absent from Mr. Scott's statement. According to counsel, Mr. Scott described the shooting as "an accidental discharge and implied that there was a struggle over a firearm at one point in time." Counsel asserted that if the defense had been able to locate Mr. Scott, and if Mr. Scott had testified, he would have given testimony similar to the statement he gave Investigator Hernandez, which would have contradicted Mr. Williamson's testimony about being unarmed.

The prosecutor asserted that during appellant's trial law enforcement officers were actively hunting for Mr. Scott, who was considered a codefendant. After Ms. Lewis identified Mr. Scott's photograph, the prosecution had only Mr. Scott's name, date of birth, and address. The prosecution did not have a statement from Mr. Scott or any exculpatory evidence. The prosecutor speculated that it was unlikely that Mr. Scott once he was found and charged would have taken the witness stand to testify. The prosecutor argued that Mr. Scott's statements to Investigator Hernandez were self-serving because he said, "'I never saw the shooting. I saw a gun that was within the reach of both Mr. Travis and Mr. Williamson and I coincidentally or luckily turned my head and heard a shot.' " As a final point, the prosecutor argued that appellant, who had known Mr. Scott for a long time and had picked Mr. Scott up at Mr. Scott's house on the night of the shooting,[7] knew Mr. Scott's whereabouts.

Appellant took the witness stand and testified that he had known Mr. Scott since 2005 or 2006. Appellant said that Mr. Scott was not a close friend, rather he was somebody he knew and they would "hang out" occasionally. Appellant denied knowing exactly where Mr. Scott lived, but knew the general area. Appellant claimed to have picked up Mr. Scott on "90th" in Oakland on the day of the shooting.[8] Appellant acknowledged that between the time of the incident and him being arrested he had spoken to Mr. Scott. Appellant claimed to have Mr. Scott's telephone number memorized. However, he confirmed that telephone number was 510–809–7857.

Before appellant testified, the court asked for clarification on the telephone number for Mr. Scott that Ms. Lewis had provided to a defense investigator. According to the court, in his declaration the defense investigator stated that he had received a telephone number of 510–302–7785 for Mr. Scott back in October 2009 and had attempted to contact Mr. Scott on that number. The prosecutor confirmed that the number was an accurate telephone number for Mr. Scott and was used to ultimately identify Mr. Scott. At this point in the proceedings, defense counsel did not dispute that his investigator had the correct telephone number for Mr. Scott.

On cross-examination, appellant disputed Mr. Scott's statement that he had been picked up from his house by appellant on the day of the

---

[7] In his statement to Investigator Hernandez, Mr. Scott claimed that he was picked up from his house in Oakland by appellant.

[8] We assume that appellant meant 90th avenue.

shooting. Appellant insisted that he picked up Mr. Scott that day at 90th and McArthur. Appellant admitted that he had Mr. Scott's telephone number; during the 12 days between the shooting and the time appellant was arrested, appellant admitted that he spoke to Mr. Scott a few times.

Under questioning from the court, appellant testified that he had Mr. Scott's telephone number recorded in his cellular phone and that Mr. Scott's name would come up when Mr. Scott called him. However, appellant disputed that the number he had was the same number used by the prosecution to locate Mr. Scott.

The court made a finding that it did not believe appellant did not know Mr. Scott's whereabouts. Specifically, the court stated, "I don't believe the defendant did not know the whereabouts of Mr. Scott both based on his testimony, his body language in testifying, the close relationship they appeared to have and the fact that Ryne Scott said that without knowing it was going to harm the defendant because it seemed pretty innocuous, that the defendant picked him up at his house."

At the conclusion of the hearing, the court found not "one scintilla of evidence to support a Brady violation in this case." The court went on to say that the prosecution possessed nothing exculpatory as to appellant. Furthermore, even if the defense could have obtained a statement from Mr. Scott similar to the one Mr. Scott gave Investigator Hernandez, the court would have found it inadmissible because it was "clearly self-serving" and unreliable and thus not a declaration against interest.

The court found it unlikely that Mr. Scott would have testified at appellant's trial and given exculpatory testimony. Specifically, the court said, "These are a lot of speculations, most of them based on premises that are not reasonable and do not normally take place that he possibly would have given a statement once he's charged, to the defense. There would have been the same statement whenever it was taken, that he possibly would have gotten on the stand. Very rare, almost never. And he possibly could have testified and gave the same self-serving statement."

In addition, the court found that "the defendant in this case could have obtained any evidence from Ryne Scott with any reasonable diligence. And that's because he was the only one that knew where Ryne Scott lived. Everyone else was on a fishing expedition basically."

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Accordingly, the court denied appellant's motion to set aside his conviction based on a *Brady* violation.

*Travis*, 2013 WL 989359, at *3-5.

In reviewing these circumstances, the appellate court agreed with the trial court that no *Brady* violation occurred because Mr. Scott's existence was known to defense counsel and Mr. Scott's true name and location was not by itself exculpatory evidence. *Id*. at *11-13. The reasonable factual findings affirmed by the appellate court show that petitioner "had a close relationship with Mr. Scott, and despite his protestations to the contrary, as the [trial] court found, knew where Mr. Scott lived and how to locate him." *Id*. at *13. The trial court was "absolutely confident" that the petitioner picked up Mr. Scott at his house on the day of the shooting, finding the petitioner's testimony to the contrary not credible. (Dkt. No. 15-7, "9RT," at 822-23.) A review of the trial record confirms the reasonableness of this determination. Consequently, no *Brady* violation occurred because there can be no suppression where, as here, the petitioner "knew or should have known the essential facts permitting him to take advantage of any exculpatory information." *Travis*, 2013 WL 989359, at *13 (quoting *Coe v. Bell*, 161 F.3d 320, 344 (6th Cir. 1998) (witnesses "to whom [the defendant] had as much access as the police" did not constitute information that was "under the sole control of the government or improperly kept from [the defendant]")); *Aichele*, 941 F.2d at 764; *Dupuy*, 760 F.2d at 1502 n. 5.

Even if the petitioner had established that the government suppressed Mr. Scott's name and address, the appellate court found that petitioner's *Brady* claim also failed for the independent reason that such information has no exculpatory value. Said otherwise, the appellate court found that this information alone is not "favorable" to the petitioner, and therefore cannot form the basis of a *Brady* claim. On this point, the petitioner points to no clearly established Supreme Court precedent that would contravene the appellate court's determination. Indeed, the "mere identity of witnesses is not exculpatory and is not covered by *Brady*." *United States v. Boyce*, 564 F.3d 911, 918 (8th Cir. 2009).

Rather than addressing whether Mr. Scott's identity and location is information favorable to the defense, the petitioner instead pivots, arguing that the statement ultimately elicited by the

government's investigator was the favorable evidence.[9]  Specifically, the petitioner claims that Mr. Scott's statement contradicted the victim's version of the incident, and therefore could have been used to impeach the victim's testimony against him.  In opposition, the respondent contends that the impeachment value of Mr. Scott's statement is irrelevant because it was otherwise not material, *i.e.* prejudicial.  In other words, there is not a reasonable probability that the outcome of petitioner's trial would have been different had the defense used Mr. Scott's identity and location to obtain a statement from him similar to the one he gave the government investigator.  The Court agrees.

First, Mr. Scott likely would have invoked his Fifth Amendment right against self-incrimination rather than taking the witness stand and testifying at petitioner's trial.  Mr. Scott was deemed a co-defendant, and in such cases, the trial court correctly noted that such a situation would "almost never" occur because Mr. Scott's lawyer would have advised him against testifying.  (9RT at 821.)  Accordingly, the Court agrees with respondent that there is not a "reasonable probability" that the defense could have elicited live testimony from Mr. Scott that would have changed the outcome of the case. *See United States v. Bagley,* 473 U.S. 667, 682 (1985).

Second, the Court agrees with respondent that, absent Mr. Scott's live testimony, Mr. Scott's out-of-court statement was not material.  The trial court determined that a statement from Mr. Scott similar to the one he gave the government investigator would not have been admissible at petitioner's trial.  (*Id*. at 821-23.)  More specifically, the trial court found that Mr. Scott's statement would not have been admissible as a statement against interest because the trial court found that Mr. Scott's statement to the investigator was an "unbelievable self-serving statement."  (*Id*. at 821.)  This evidentiary ruling is presumed correct and not reviewable by a federal habeas court. *Waddington v. Sarausad*, 555 U.S. 179, 192 n.5 (2009) ("it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions") (quoting *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991)).  On this record, Mr. Scott's statement could not have produced a

---

[9] For purposes of this argument, the Court assumes, without deciding, that the contents of Mr. Scott's statement to the government investigator could be *Brady* material even though the government did not possess it before or during the petitioner's trial.  This statement was unquestionably obtained after the jury convicted petitioner, and was promptly turned over to defense counsel within days.  (Dkt. No. 14-2, "2CT," at 360.)

United States District Court
Northern District of California

1   different verdict.  Thus, the state court's determination that no *Brady* violation occurred is not

2   contrary to clearly established Supreme Court precedent.  *See Bagley,* 473 U.S. at 682.

3        Finally, in a related claim, petitioner argues the prosecutor suppressed evidence in violation

4   of *Brady* by allegedly delaying the interview of Mr. Scott until after petitioner was convicted.

5   Again, petitioner does not address whether, or how, the state court unreasonably applied Supreme

6   Court precedent to determine that the delay did not constitute a *Brady* violation.  Nor does

7   petitioner point to any federal law that dictates a contrary result.[10]  This claim must also fail.  As

8   discussed above, the state court reasonably found that petitioner knew how to contact Mr. Scott

9   before the government learned his real identity and location.  And, petitioner has cited no authority

10  for the proposition that a delay by the government in interviewing a witness can constitute

11  suppression of material evidence favorable to the defense, as required under *Brady*.

12       Under these circumstances, the petition on *Brady* grounds fails.  The state court's rejection

13  of the petitioner's *Brady* claims is affirmed.

14  **III.    INEFFECTIVE ASSISTANCE OF COUNSEL CLAIM**

15       Alternatively, the petitioner claims he was deprived of effective assistance of counsel if his

16  trial counsel had sufficient information to locate Mr. Scott but failed to do so.  Claims of ineffective

17  assistance of counsel are examined under *Strickland v. Washington*, 466 U.S. 668 (1984).  To

18  prevail on a claim for ineffectiveness of counsel, a petitioner must establish two factors.  First, he

19  must establish that counsel's performance was deficient, *i.e.*, that it fell below an "objective

20  standard of reasonableness" under prevailing professional norms, *id.*at 687-88, "not whether it

21  deviated from best practices or most common custom,"  *Harrington v. Richter*, 562 U.S. 86, 105

22  (2011) (citing *Strickland*, 466 U.S. at 690).  "A court considering a claim of ineffective assistance

23  must apply a 'strong presumption' that counsel's representation was within the 'wide range' of

24  reasonable professional assistance."  *Id*. at 104 (quoting *Strickland*, 466 U.S. at 689).  Second, he

25  must establish that he was prejudiced by counsel's deficient performance, or that "there is a

26  reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding

27  ────────────

28  [10] In fact, the memorandum submitted in support of the petition does not cite *any* law in the section entitled: "The prosecution violated *Brady* by waiting to take a statement from Scott after the conclusion of the trial."  (Dkt. No. 1 at 14-15.)

1    would have been different." *Strickland*, 466 U.S. at 694.  "A reasonable probability is a probability

2    sufficient to undermine confidence in the outcome." *Id.*  Where the petitioner is challenging his

3    conviction, the appropriate question is "whether there is a reasonable probability that, absent the

4    errors, the factfinder would have had a reasonable doubt respecting guilt." *Id.* at 695.  "The

5    likelihood of a different result must be substantial, not just conceivable." *Richter*, 562 U.S. at 112

6    (citing *Strickland*, 466 U.S. at 693).

7          The record shows that the petitioner has never before presented this ineffective assistance

8    claim to a state court.[11]  The Court may nevertheless reach the merits and deny such a claim

9    "notwithstanding the failure of the [petitioner] to exhaust the remedies available in the courts of the

10   State."  28 U.S.C. § 2254(a)(2).  In this circumstance, the Court will review petitioner's

11   unexhausted claim de novo, rather than under the deferential standard of review prescribed by

12   AEDPA, 28 U.S.C. section 2254(d).  *See Lewis v. Mayle*, 391 F.3d 989, 996 (9th Cir. 2004) ("De

13   novo review…is applicable to a claim that the state court did not reach on the merits") (citing

14   *Nulph v. Cook*, 333 F.3d 1052, 1056 (9th Cir. 2003)).

15         Here, the petitioner contends that if his defense counsel had information sufficient to locate

16   Mr. Scott, then his counsel's failure to locate and secure a statement from Mr. Scott renders his

17   counsel constitutionally ineffective.  Petitioner fundamentally fails to present evidence to overcome

18   the strong presumption that his counsel's conduct was reasonable.  *Richter*, 562 U.S. at 104.  That

19   petitioner "is not aware of any tactical reasons" (Dkt. No. 1 at 16:18) that defense could would

20   choose not to attempt to locate Mr. Scott and get a statement from him is not an adequate showing.

21   On a claim for ineffectiveness of counsel, "the absence of evidence cannot overcome the 'strong

22   presumption that counsel's conduct [fell] within the wide range of reasonable professional

23   assistance.'"  *Burt v. Titlow*, 134 S.Ct. 10, 17 (2013).  Of course, defense counsel may have not

24
_____

25         [11] Petitioner did raise a claim of ineffective assistance of counsel in an earlier petition for
     writ of habeas corpus to the California Court of Appeal.  (Dkt. No. 16-7.)  That petition argued that

26   defense counsel was constitutionally ineffective because counsel failed to cross-examine the
     prosecutor and government investigator regarding when they learned of Mr. Scott's identity and

27   location.  (*See id.* at 56.)  The appellate court summarily denied this petition on March 14, 2013, the
     same day it issued its order denying petitioner's direct appeal.  *See People v. Travis*, 2013 WL

28   989359, at *1-3 (Cal. Ct. App. March 14, 2013), *review denied* (June 12, 2013).

secured a statement Mr. Scott for a variety of reasons.[12]  It is not the province of this Court to speculate as to defense counsel's motives.  Petitioner has the burden to establish that defense counsel's conduct was constitutionally deficient.  Petitioner has failed to meet this burden.

Even assuming, *arguendo*, that petitioner could show that his trial counsel's performance was objectively unreasonable, petitioner fails to show any resulting prejudice.  As discussed above, the state court found there was a high likelihood that petitioner would have asserted his Fifth Amendment rights if subpoenaed to testify at petitioner's trial.  Absent live testimony, the trial court also ruled that Mr. Scott's out-of-court statement would have been inadmissible because it was self-serving and unbelievable.  As a result, petitioner would not have benefited from his counsel obtaining a statement from Mr. Scott; the jury would not have heard it.  Defense counsel's failure to secure a statement from Mr. Scott caused no prejudice to petitioner.  Accordingly, this claim of ineffective assistance of counsel is without merit.

**IV.   CONCLUSION**

Accordingly, petitioner has not met his burden to show that he is in the custody of respondent in violation of the Constitution or laws or treaties of the United States.  His petition is **DENIED**.  A certificate of appealability will not issue.  Reasonable jurists would not "find the [Court's] assessment of the constitutional claims debatable or wrong."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  Petitioner may seek a certificate of appealability from the court of appeal.  The Clerk shall enter judgment in favor of respondents and close the file.

**IT IS SO ORDERED**.

Dated: December 2, 2015

_____
**YVONNE GONZÁLEZ ROGERS**
**UNITED STATES DISTRICT COURT JUDGE**

[12] For example, defense counsel may have attempted to contact Mr. Scott, and despite his best efforts, those attempts may have been futile.  Defense counsel may also have been well aware that, even if he had contacted Mr. Scott, that Mr. Scott would be unwilling to testify.

United States District Court
Northern District of California